UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-                                          Case No.:  2:05-cr-32-FtM-29DNF

VICTOR SALAZAR
_____

# REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on the Defendant Victor Salazar's Motion to Suppress Evidence (Doc. #17) filed on June 3, 2005.  The Government filed its response on June 9, 2005.  On June 22, 2005, a hearing was held before the Honorable Sheri Polster Chappell, United States Magistrate Judge.  At the hearing, the Government called as witnesses Corporal Theodore Epright of the Collier County Sheriff's Office (CCSO), Corporal Dwaine Parker of the CCSO, Deputy Patrick McNair of the CCSO, Special Agent Kenny Silva of Immigration and Customs Enforcement (ICE), Special Agent Shawn Mullin also with ICE, and introduced a DVD containing video and audio from the CCSO's helicopter's FLIR system.  The Defendant was represented by Miguel C. Fernandez, III.  He testified on his own behalf and introduced photographs of the area where the stop occurred.  On August 9, 2005, upon motion by the Government, and over the objection of the Defendant, the hearing was reopened to supplement the evidence with the testimony of Deputy Ronald Lussier.

## TESTIMONY AND EVIDENCE

**Corporal Theodore Epright**: (Tr. 7-31).

Cpl. Epright has served with the CCSO for ten (10) years. (Tr. 7: 24-25). He served six and a half (6.5) years with road patrol and SWAT units. (Tr.8:3-4). He has served the last four (4) years with the CCSO's canine unit. (Tr. 8:4-5). He testified as to the events that occurred in the early morning hours of March 6, 2005.

On March 6, 2005, at approximately 3:30a.m., Cpl. Epright and his canine partner were searching the area near the intersection of Westclox Rd. and State Road 29 (S.R. 29) in an effort to locate persons involved in a serious automobile accident. (Tr. 8:6-25). Cpl. Epright described the search area and surrounding location as rural pastureland with woods lining the roadside. (Tr. 9:16-22). While searching a field near the scene of the accident with his canine partner, Cpl. Epright testified that he heard four (4) rapid gunshots from what appeared to be a handgun coming from the direction of Westclox Rd. (Tr. 9:24-25, 10:1-6). Cpl. Epright looked toward the direction he heard the shots originate from, and saw a vehicle eastbound on Westclox Rd. (Tr. 10:7-23). Based on his years of training and experience, Cpl. Epright felt the gunshots originated from the vehicle traveling eastbound on Westclox Rd . (Tr. 11:2-7).

Cpl. Epright testified that the distance to the road from his position in the field was between 150 to 200 yards and that his patrol car was approximately a quarter of a mile down the road. (Tr. 12:12-20). From his position in the field, Cpl. Epright saw no other vehicles or pedestrians in the immediate area. (Tr. 12:24-25, 13:1-4). Cpl. Epright confirmed that the Defendant's vehicle was the only vehicle traveling on Westclox Rd. with the CCSO Helicopter searching the area overhead. (Tr. 11:4-18). Since he could not pursue the vehicle on his own, Cpl. Epright reported over his radio to

other officers in the area, including a CCSO helicopter, that he had heard shots fired and that he believed the shots had emanated from the vehicle traveling eastbound on Westclox Rd. (Tr. 11:20-21).

**Corporal Dwaine Parker**: (Tr. 31-74).

Cpl. Dwaine Parker is a pilot and tactical flight officer with the CCSO. The pilot flies the aircraft and the tactical officer, who is also a pilot, operates the Forward Looking Infered Imaging System (FLIR), watches for other aircraft, operates the radio, operates the helicopter's search light, and uses night vision goggles to aide officers on the ground with searches. (Tr. 32:13-22). All pilots with the CCSO are dual qualified to serve as pilot or tactical officer on the CCSO's helicopters. (Tr. 31:16-22). Cpl. Parker began serving as an auxiliary patrol officer in 1991 in Hillsboro County, Florida. He served as a patrol officer and with the traffic homicide division for four (4) years in Hillsboro county and has eight (8) years experience operating FLIR systems with the Sheriff's Departments in Hillsboro and Collier Counties. (Tr. 32:1-9).

On March 6, 2005, at approximately 3:30a.m., Cpl. Parker was serving as a tactical flight officer on a CCSO helicopter in the area above Westclox Rd. and the intersection of S.R. 29. The helicopter was aiding in the search, in conjunction with canine deputy Cpl. Epright and other officers, for the driver of a vehicle that was involved in an accident on Westclox Rd. (Tr. 34:12-25).

Cpl. Parker described the search area as rural farm area, open fields, wooded areas, and very dark. (Tr. 35:6-9, 36:24-25, 37:1-3). Cpl. Parker testified that he was using night vision goggles (NVG) and FLIR to scan the area. (Tr. 12:19-25, 13:1-21). According to Cpl. Parker, FLIR would allow him to see the body heat of anyone who was injured in the accident or hiding in adjacent fields or wooded areas. (Tr. 37:13-25). On March 6, 2005, Cpl. Parker said he searched the area beginning

at the crash scene and moving outward in a circular pattern increasing the diameter of each orbit as the search continued. (Tr. 39:20-25, 40:1-4). Approximately thirty (30) minutes into the search, he heard Cpl. Epright's radio transmission advising that he had heard gunshots. (Tr. 40:15-17). Cpl. Parker testified that Cpl. Epright's transmission and his own observations regarding the gunshots and vehicle could be heard by all the officers working the accident scene. (Tr. 52:1-12). Cpl. Parker looked up from his monitor and using his NVG saw the vehicle referenced by Cpl. Epright traveling eastbound on Westclox Rd. at approximately fifty (50) mile per hour. (Tr. 42:1-7). Cpl. Parker then got back on the FLIR and started scanning the area to make sure that there was nobody else out there or no other vehicles in the area. (Tr. 42:12-15). Cpl. Parker testified that he searched the area approximately two (2) square miles and did not see any other cars or pedestrians in the vicinity. (Tr. 42:12-21, 55:11-15). Cpl. Parker testified that Four (4) or five (5) minutes after the Defendant's vehicle was detained, he noticed another vehicle traveling down Westclox Rd. at approximately fifty (50) miles per hour. (Tr. 43:5-11). The second vehicle made an abrupt stop, pulled to the side of the road, two people emerged from the vehicle, walked around to the front, and opened the hood. (Tr. 49:23-25, 50:1-25, 51:1-10, Government's Exhibit 1 seven (7) minutes and forty three (43) seconds through ten (10) minutes and five (5) seconds). Cpl. Parker radioed the information to officers on the ground and they moved in to investigate the vehicle and its passengers. (Tr. 60:25, 61:1).

**Deputy Patrick McNair**: (75-100).

Dep. McNair has served with the CCSO for approximately one (1) year. (Tr. 75:9-10). In the early morning hours of March 6, 2005, he was standing by at the scene of the traffic accident that occurred near the intersection of Westclox Rd. and S.R. 29. (Tr. 75:21-25). Dep. McNair testified that he heard gunshots but could not determine the direction they had originated from. (Tr. 79:14-

15). However, Dep. McNair heard Cpl. Epright's radio transmission concerning the gunshots and proceeded to the location where the Defendant's vehicle was last observed traveling eastbound on Westclox Rd. (Tr. 80:3-10). When he arrived, the Defendant's vehicle had already been stopped by Deputy Lussier. (Tr. 85:3-9). Dep. McNair extracted the Defendant from his vehicle, searched him, and handcuffed him. (Tr. 87:4-15). After the passengers in the vehicle were secured by other officers on the scene, Dep. McNair proceeded to search the vehicle. (Tr. 81:2-3). Dep. McNair testified that he believed, based on Cpl. Epright's radio transmission, that there was a firearm in the vehicle. (Tr. 80:20-24). He searched the vehicle's interior. (Tr. 81:2-3). During his search, Dep. McNair found a Smith & Wesson revolver under the driver's seat. (Tr. 81:5-6). There was an obvious odor of gun powder emanating from the revolver. (Tr.81:15-18). He opened the revolver's cylinder and found five spent shells in the chamber. (Tr. 81:15-18).

**Special Agent Kenny Silva:** (Tr. 101-116).

Agt. Silva has served with Immigration and Customs Enforcement (ICE) for approximately one (1) year. (Tr. 101:2). Agt. Silva testified that on March 7, 2005, he accompanied Special Agent Shawn Mullin also with ICE, as a Spanish interpreter, to the Collier County Jail to interview the Defendant. (Tr. 101:8-18). Agt. Mullins testified that he read the Defendant his Miranda rights in Spanish. (Tr. 102:24-25, 103:1-2). He testified that he asked the Defendant if he understood those rights and that the Defendant acknowledged that he understood and waived his Miranda rights. (Tr. 103:3-12).

**Special Agent Shawn Mullin**: (Tr. 116-127).

Agt. Mullin interviewed the Defendant at the Collier County Jail on March 7, 2005, along with Agt. Silva who acted as Agt. Mullin's interpreter. (Tr. 116:16-25, 117:1-25). Agt. Mullin

testified that he handed Agt. Silva a card provided by ICE to its agents with the Miranda warnings written on one side. (Tr. 119:3-12). Agt. Mullin observed Agt. Silva read the Defendant his Miranda rights off the card and heard the Defendant give a verbal acknowledgment that he understood his rights. (Tr.120:3-12). While Agt. Mullin could not testify what the Defendant assented to, he believes that based on the flow of the conversation, Agt. Silva faithfully interpreted the Miranda rights as listed on the card into Spanish for the Defendant. (Tr.120:8-12). The Defendant was cooperative throughout the interview. (Tr. 121:12-15). The interview was not recorded by video or audio tape. (Tr. 122:9-18).

**Deputy Ronald Lussier**: (Presented August 9, 2005, Tr. II. 1-41).

Dep. Lussier has served with the CCSO in road patrol for approximately two (2) years. (Tr. II. 6:1-5). Prior to his service with the CCSO, Dep. Lussier served five years with the military police. (Tr. II. 18:17-19) Dep. Lussier testified to the events that occurred in the early morning hours of March 6, 2005. (Tr. II. 6:6-8).

Dep. Lussier testified that he was working a perimeter search looking for accident victims from a vehicle rollover accident in the early morning hours on Westclox Rd. near the intersection of Westclox and S.R. 29 when he heard four to five gunshots coming from the west of his position down Westclox Rd. (Tr. II. 7:2-12, 8:13-15). According to Dep. Lussier, he communicated over the air that he heard gunshots. (Tr. II 9:2-5). He also overheard Cpl. Epright's communication that he had heard gunshots fired from his position in a nearby field. (Tr. II.9:14-25, 10:1-13). The Government played an audio exerpt from Government's Exhibit 1. During the playing of the audio Dep. Lussier identified the voice of Cpl. Epright stating he heard gunshots fired and himself stating that he heard gunshots fired as well. (Tr. II. 17:5-28).

Dep. Lussier testified that the gunshots were fired close to his position and that even with the sound of the helicopter orbiting overhead, he could clearly hear the shots. (Tr. II.12:3-14). During his training with the military police, Dep. Lussier received training that enabled him to determine which direction gunshots were being fired from. (Tr. II.19:2-22). Dep. Lussier testified that the shots came from west of his position down Westclox road. (Tr. II 8:15-22).

The Defendant's vehicle came toward Dep. Lussier's position on Westclox Rd. just seconds after he heard the shots fired. Dep. Lussier stood in the road waiving his flashlight and stopped the Defendant's vehicle. (Tr. II. 10:22-25, 11:1-3, 26:18-23). Dep. Lussier testified that he made the traffic stop in order to conduct an investigation based upon his own personal observations and Cpl. Epright's radio transmissions regarding the gunshots. (Tr. II. 10:10-25, 11:1-7). After stopping the Defendant's vehicle, Dep. Lussier called for backup. (Tr. II. 12:15-20). Dep. Lussier said he approached the vehicle with his weapon drawn but down at his side in the low ready position. (Tr. II. 29:15-25). Backup also approached with their weapons drawn . (Tr. II.30:13-18). Dep. Lussier testified that he was not the officer that approached the vehicle to remove the Defendant and other passengers in the vehicle. (Tr. II ). According to his recollection at the hearing, Dep. Lussier testified that Dep. Howell was the officer that removed the Defendant and spoke with him. (Tr. II. 31:10-11). Dep. Lussier did not speak with nor have further contact with the Defendant.

**Victor Salazar:** (Tr. 127- 155).

The Defendant testified that in the early morning hours (around 3:35a.m.) he was traveling on Westclox Rd. near Immokalle, Collier County, Florida, with four other passengers in his vehicle. (Tr. 128:23-25, 129:1-2) He stated that he had been driving around for about an hour. (Tr. 129:11-16). At the time he was stopped, he testified that was heading home. (Tr. 129:8-10). The Defendant

testified it was dark and that he was traveling around 35 to 36 miles per hour as he proceeded down Westclox Rd. (Tr. 143:2-7). The Defendant acknowledged that shots were fired from his vehicle but that the shots were fired about a mile and a half to two miles from the intersection of Westclox and S.R. 29 or about a mile or maybe a bit more from where the officers made the stop. (Tr. 130:6-19). The Defendant stated that he was unfamiliar with the area except that he acknowledged that he passed a four way stop and turned onto Westclox when the shots were fired. (Tr. 140:19-25, 141:1-22).

The Defendant testified that he was headed down Westclox Rd. when he was detained by a uniformed officer holding a flashlight. (Tr. 133:19-24). The officer with the flashlight pointed a gun at his vehicle and he stopped his car. (Tr. 133:19-25). The officer was positioned near his patrol car which was parked half in the roadway and half in the grass along the shoulder. (Tr. 134:1-15). The Defendant felt he had to stop. (Tr. 134:17-20).

Another officer came to his door, removed him, threw him to the ground, searched him, handcuffed him, and placed him in the back of a patrol car. (Tr. 134:21-25, 135:1-5). Other officers arrived and removed the passengers from the car. (Tr. 135:8-10). The Defendant testified that the passengers were also thrown to the ground, searched, and taken to the back of the vehicle, but they were not handcuffed. (Tr. 135:11-24). The officers took his license out of his pocket and searched his vehicle. (Tr. 135:25, 136:1-15). The Defendant testified that at no time did he authorize the search of his person or his vehicle. (Tr. 136:16-18). The Defendant's vehicle was towed away and he was taken to jail.(Tr. 136:8-25). At no time did any of the arresting and/or searching officers read him his Miranda rights. (Tr. 136:19-22).

The following day, March 7, 2005, prior to his initial appearance, two (2) officers from immigration came to the jail to interview him. (Tr. 137:1-15). He told the immigration officials that he was arrested for an open container in his vehicle but that he was not drinking that others in the car were. (Tr. 151:2-25, 152:1-7). The immigration officials asked him if he was also detained for a firearm and he responded yes. (Tr. 152:9-14). The Defendant testified that the two immigration officers told him that they were there to help speed his return to Mexico so he agreed to speak with them. (Tr. 137:16-20). The Defendant testified that he had no trouble understanding the questions and that he willingly spoke with the immigration officials. (Tr. 152:15-18). However, the immigration officers never read him any Miranda rights and never told him about any criminal charges being filed against him. (Tr. 138:5-23). The Defendant testified that if he had known that he had the right to remain silent and that criminal charges were being filed against him, he would not have spoken to the immigration officials. (Tr.139:3-5).

## DISCUSSION

The Fourth Amendment protects individuals from unreasonable search and seizure. U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) *cert. denied,* 534 U.S. 830 (2001). The Defendant argues that his Fourth and Fourteenth Amendment rights were violated because (1) the Defendant did not give Dep. McNair permission to search his vehicle, and (2) the Defendant's statements should be suppressed because the special agents from ICE did not Mirandize the Defendant prior to interviewing him at the Collier County jail. In this particular case, the Court must first determine whether or not the officers on the scene in the early morning hours of March 6, 2005, had a reasonable articulable suspicion that the Defendant had committed or was about to commit a crime.

*(1) Whether Officer's Stopping Defendant's Vehicle had a Reasonable Articulable Suspicion that the Defendant was Armed*

Under Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed. 2d 889 (1968), "in evaluating the constitutionality of an investigatory stop, the court must examine whether the officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." U.S. v. Powell, 222 F.3d 913, 917 (11th Cir. 2000) (internal quote omitted). In Terry, the Supreme Court held that an officer may briefly detain a person for an investigatory stop if they have a "reasonable articulable suspicion" that the person has engaged in or is about to engage in, criminal activity. 392 U.S. at 27. The "reasonable suspicion" must be more than an "inchoate and unparticularized suspicion or hunch." Id. Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than a preponderance of the evidence, however, the Fourth Amendment requires at least a minimal level of objective justification, taken from the totality of the circumstances, before a stop can be made. Powell, 222 F.3d at 917 (citing Illinois v. Wardlow, 528 U.S. 119, 120 S. Ct. 673, 145 L.Ed. 2d 570 (2000)). Thus, in order to determine whether or not a specific Fourth Amendment requirement such as probable cause or reasonable suspicion has been met, the court must determine if the officer's actions were reasonable. Ornelas v. U.S., 517 U.S. 690, 696, 116 S.Ct. 1657, 1661-1662 (1996).

In reviewing the reasonable suspicion determination made by an officer, the Court looks to the totality of the circumstances to see if the officer has a particularized and objective basis for suspecting legal wrongdoing. U.S. v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981). Police officers are allowed to make inferences from their own experience and specialized training and make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. U.S. v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151

L. Ed. 2d 740 (2002) (citing Cortez, 449 U.S. at 418). The concept of reasonable suspicion is not reducible to a "neat set of legal rules," and conduct which is innocent in itself may still establish reasonable suspicion in light of an officer's specialized training and familiarity with the customs of an areas inhabitants. Id. at 274-276. A determination that reasonable suspicion exists need not rule out the possibility of innocent conduct. Id. at 277-278. If reasonable suspicion exists, an officer may "stop the person for a brief period of time and take additional steps to investigate further." Hiibel v. Sixth Judicial District Court of Nevada, 542 U.S. 177, 124 S. Ct. 2451, 2458, 159 L. Ed. 2d 292 (2004)

Furthermore, it is the collective knowledge of the officers involved in the stop which is reviewed to determine whether a reasonable suspicion exists. U.S. v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004). This is satisfied if the officer who ordered the stop has a reasonable suspicion, even if the officer who actually conducts the stop lacks reasonable suspicion. U.S. v. Powell, 222 F.3d 913, 918 (11th Cir. 2000); U.S. v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998) *cert. denied* 526 U.S. 1032, 1104 (1999).

In this case, it is clear that the canine officer at the scene, Cpl. Epright, heard gunshots and that based upon his training and experience he believed that the shots were fired from the Defendant's vehicle. His impressions were confirmed by Cpl. Parker, who with the aide of the CCSO helicopter's FLIR system, noted that no other vehicles were present on Westclox Rd. Cpl. Epright radioed over an open frequency that he heard four (4) gunshots fired in rapid succession from a vehicle and that the Defendant's car was involved. (Gov't. Exhibit 1 at 00:10-2:00). Based upon Cpl. Epright's transmissions, the CCSO helicopter spotted and tracked the Defendant's vehicle and noted that there were no other vehicles in the immediate area. (Tr. 42:1-15). Dep. Lussier testified that he stopped

the vehicle based upon the radio transmission from Cpl. Epright and his own personal observations that shots had been fired from the vehicle traveling down Westclox Rd. (Tr. II. 11:3-7, 17:15-25, 18:1-4).

Based upon the radio transmission provided by Cpl. Epright, and Dep. Lussier's own observations, he had an objectively reasonable suspicion that Salazar had engaged in a crime. U.S. v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004) (citing U.S. v. Powell, 222 F.2d 913, 917 (11th Cir. 1997) (quoting Terry, 392 U.S. at 27)).  It is well established that a Terry stop can be used to investigate those suspected of being involved in the commission of a crime. Riley v. City of Montgomery, Ala., 104 F. 3d 1247, 1251 (11th Cir. 1997).  Thus, Dep. Lussier's stop of the Defendant's vehicle did not violate the Fourth Amendment.

The Defendant further asserts that the search of his vehicle by Dep. McNair, after the stop was made, was invalid because the Defendant never consented to the search. However, regardless of the Defendant's consent, a warrantless weapons search of a suspect and his car, pursuant to a limited detention, does not violate the Fourth Amendment if the police have a reasonable articulable suspicion of wrongdoing. Terry, 392 U.S. at 26-28. Dep. McNair knew from the radio transmission and his own personal experience that someone had fired a gun in the area.  After hearing Cpl. Epright's radio transmission, it was reasonable for Dep. McNair to assume that the shots had been fired from the Defendant's vehicle.  Thus, based upon the collective knowledge possessed by Dep. McNair, he did not violate the Fourth Amendment by searching the Defendant's vehicle for a weapon. Michigan v. Long, U.S. 1032, 1050-1051, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983)(holding that the police are entitled to search the passenger compartment of the detainee's vehicle for weapons)(citing Terry, 392 U.S. at 26)).

### *(2) Whether the Defendant was Properly Mirandized by Special Agents Silva and Mullin*

Miranda v. Arizona, requires that before a defendant in custody can be interrogated that the defendant be informed of: (1) the defendant's right to remain silent; (2) that statements can and will be used against them in a court of law; (3) that the defendant has the right to an attorney during questioning; and (4) that if the defendant cannot afford an attorney, one will be appointed., 384 U.S. 436, 478-479 (1966). Under Miranda, custody is the deprivation of freedom of action normally associated with an arrest. Id. at 444. No one disputes that the Defendant's interview was a custodial interrogation.

In the instant case, Agt. Silva testified that he read the Defendant his Miranda rights in Spanish and that he acknowledged his understanding of those rights. (Tr. 102:24-25, 103:1-10). The Defendant asserts that he was never read his Miranda rights and that the only reason he spoke with Agts. Silva and Mullin was due to their promise that they were there to help speed his return to Mexico. (Tr. 137:16-25, 138:1-8). In the alternative, the Defendant claims that if his Miranda rights were read to him, they were not properly presented because he was not advised that he could stop talking at anytime after the interview had begun. Because of the conflicting testimonies between the ICE agents and the Defendant, the Court must first conduct a credibility analysis to determine whose testimony is the more reliable.

### *(a) Credibility Analysis*

When weighing the credibility of witnesses, the Court does not look at the status of the witnesses, but rather the Court must weigh the testimony of all the witnesses, the consistencies or inconsistencies in their testimonies, their demeanor on the stand and the witnesses' interest in the outcome of the hearing. U.S. v. Ramirez-Chilel, 289 F.3d 744, 749-750 (11th Cir. 2002). The

testimony of the ICE agents substantially corroborated each other. Agt. Silva testified that he read the Defendant his <u>Miranda</u> rights in Spanish and that the Defendant acknowledged those rights. (Tr. 111:9-25). Agt. Mullins testified that he asked Agt. Silva to accompany him to the interview to act as a Spanish interpreter and that he gave Agt. Silva a card listing the <u>Miranda</u> rights. (Tr. 119:3-12). Agt. Mullins testified that while he does not speak Spanish he did observed Agt. Silva reading from the card and then translating into Spanish for the Defendant. He noted the Defendant's actions indicated that he understood his <u>Miranda</u> rights and consented to talk with him. (Tr. 119:17-25, 120:1-12). Further, Agt. Silva testified that he advised the Defendant of his <u>Miranda</u> rights and that the Defendant agreed to speak with them without an attorney present. (Tr. 120:10-12).

The fact that the Defendant's alternative argument acknowledges that he was indeed read his <u>Miranda</u> rights is a strong indication to the Court that Agts. Silva and Mullin's testimony was correct. The Defendant cannot have it both ways. He cannot claim that he was never read his Miranda rights and also argue that his rights were improperly read because they did not include a statement that he could stop talking at any time. Further, the Court notes that the Defendant is faced with possible jail time should he be convicted of the firearms charge. Thus, he has the most to gain by having the incriminating statements suppressed. After reviewing the inconsistency in the Defendant's testimony and the arguments presented at the hearing, the demeanor of the witnesses involved, and weighing the potential outcome to the witnesses, the Court determines that the testimony of Agts. Silva and Mullin is the more credible. Thus, the Court will proceed, based upon the credibility finding.

Having determined that the Defendant was read his <u>Miranda</u> rights in Spanish and that the Defendant acknowledged those rights, the Court must now consider whether Agts. Silva and Mullin

violated the Defendant's Miranda rights by using a false promise of help to aide him to return to Mexico and/or by not telling him he could stop speaking to them at any time.

Once Miranda waiver determination has been made, the Court must determine whether the incriminating statement was made voluntarily. U.S. v. Rush, 2005 WL 1787684 *1 (11th Cir. July 28, 2005) (citing U.S. v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994). The determination of whether a statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. Rush, 2005 WL 1787684 at *1. Conduct sufficient to render a statement involuntary normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Id. (quoting U.S. v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1988); Hutto v Ross, 429 U.S. 28, 30, 97 S. Ct. 202, 50 L. Ed. 2d 194 (1976). The Defendant asserts that his reliance on the promise made by Agts. Silva and Mullins that they were there to help speed his return to Mexico rendered his cooperation involuntary.

The standard requires that a promise be made that induces a confession. The agents testified that they never promised the Defendant that they would speed his return to Mexico in exchange for a confession. (Tr. 122:9-13). Instead, Agts. Silva and Mullin testified that they merely stated that they were immigration officials and were there to help discuss his immigration status in the United States. (Tr. 101:12-25, 102: 19-23). However, even if Agts. Silva and Mullin had told the Defendant they were with immigration and were there to help speed his return to Mexico, without more, would not have made the Defendant's incriminating statements involuntary. See Oats v. Singletary, 141 F.3d 1018, 1027 (11th Cir. 1998) (holding that officer's promise that he could not promise him anything except that he would talk to everybody in the system about getting the defendant help and that he

-15-

would talk to the State Attorney's Office about the defendant's bond; I'll promise you that, did not make the defendant's confession involuntary because there was no conditional promise of leniency); Williams v. Johnson, 845 F.2d 906, 909 (11th Cir. 1988) (holding that a promise by an officer that he would let the appropriate authorities know if the defendant cooperated did not render the defendant's statements involuntary).

      The Defendant testified that he would never have spoken to the agents if he had known they were going to ask him questions regarding criminal matters. (Tr. 138:5-8). However, when questioned about the reason for his arrest, the Defendant admitted that he told the agents that he knew he had been arrested in relation to the firearms charge.(Tr. 152:5-15). The Defendant acknowledged that he understood their questions and further that he did not question in his mind why the agents were asking him about the incident regarding the firearm charges that had occurred on the previous day. (Tr. 152:15-25,153: 1-11). The Defendant answered the questions freely and never indicated to Agents Silva and Mullins after the questioning changed from immigration issues to the firearms charges that he did not want to answer their questions. (Tr. 153:1-16). *See* Rush, 2005 WL 1787684 at *2 (upholding district court decision that defendant voluntarily waived his Miranda rights because at no point during he interview did he ask the agent to stop questioning him). Thus, any incriminating statements made the Defendant were made freely and voluntarily without any promise or inducement that violated his Miranda rights.

      The Defendant further asserts that he was improperly mirandized because Agts. Silva and Mullins did not convey to him that he could stop the interview when the topic changed from immigration issues to the open container and firearm charges brought against him on the previous day. The Defendant cites several cases where Courts have approved specific warnings that the

Defendant has a right to stop the interview at any time. *See* <u>U.S. v Lacy</u>, 446 F.3d 511, 512-513 (5th Cir. 1971) (holding that telling an individual he has the right to stop talking at anytime with a lawyer present complied with <u>Miranda</u>). However, <u>Miranda</u> only requires that the Defendant be informed of his right to remain silent, that statements can and will be used against them in a court of law, that the Defendant has the right to an attorney during questioning, and that if the Defendant cannot afford an attorney one will be appointed. <u>U.S. v. Harris</u>, 2005 WL 1793517 (11th Cir. July 29, 2005).

Further, it is important to note, that the United States Supreme Court has never held that <u>Miranda</u> warnings be given in any kind of precise formulation or exact form as described in the original decision. <u>Id.</u> (citing <u>California v. Prysock</u>, 453 U.S. 355, 359, 101 S. Ct. 2806, 69 L. Ed. 2d 696 (1981)). The inquiry is simply whether the warnings reasonably conveyed the Defendant his rights as required by <u>Miranda</u>. <u>Harris</u>, WL 1793517 at * 3. Thus, it was not necessary for Agt. Silva to inform the Defendant that he could stop the interview at any time after he had already been advised that he had the right to remain silent.

Accordingly it is hereby **RECOMMENDED:**

The Defendant Victor Salazar's Motion to Suppress Evidence (Doc. #17) should be **DENIED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended at Fort Myers, Florida, this __18th__ day of August, 2005.

*/s/ Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record